**UNITED STATES of America, Plaintiff,**

v.

**Jesus GARCIA et al., Defendants.**

**No. CR–75–789–TUC–JAW (TFM).**

United States District Court,
D. Arizona.

April 5, 1976.

Joseph P. Covington, Asst. U. S. Atty., Tucson, Ariz., for plaintiff.

Richard Oseran, Tucson, Ariz., for defendants.

## MEMORANDUM

MURPHY, Senior District Judge.

Charles Dickens began A TALE OF TWO CITIES with the phrase: "It was the best of times * * *." Obviously he could not see the better times to come, particularly in 1964 when a benevolent United States Congress would pass the Criminal Justice Act, which provides for Government-paid counsel to defendants in the Federal courts who are financially unable to obtain counsel. The appropriation for that experiment in criminal justice for the fiscal year 1975 was $15,826,000; and $16,590,000 was requested for the fiscal year 1976, which, it has been indicated, will be inadequate.

In the instant case the above named defendants Jesus Garcia and Jesus A. Apodaca, since first arraigned before a magistrate after their arrest, were represented by "retained" counsel Richard Oseran, Esq. of Tucson. They were indicted with others on various charges relating to the smuggling and possession of large quantities of marijuana. On their behalf Mr. Oseran made a motion to suppress the contraband that was seized on October 17, 1975. The seized marijuana totaled 1370 pounds. Thereafter they were found guilty by this Court of the intentional and known possession of marijuana with intent to distribute the same in violation of Federal law. On March 23, 1976 this Court sentenced each defendant to two and one-half years in the custody of the Attorney General, each sentence containing a special parole term of three years.

---

Prior to sentencing the defendant Apodaca told the Probation Officer:

"Jesus Apodaca reports that he became involved in the instant offense due to the fact that he was badly in need of money. He reports that he met a man at Randolph Park one day and was offered $800 to drive a truck from Lukeville to Tucson. Approximately two weeks after meeting this man, Apodaca contends that the man called him at the Pirate's Den nightclub and told him to go to Lukeville and pick up the stake vehicle and drive it to Kennedy Park, park it and leave the keys in the ashtray. It was Apodaca's understanding that the unknown man would contact him later on and pay him $800 for driving the vehicle. Apodaca reports that although he was not sure the truck contained marijuana, he at least knew that there must be something illegal about the activity.

"Apodaca is adamant in his claim that his only part in the operation was that of driver of the vehicle, and he disclaims any knowledge as to the ownership of the marijuana or its ultimate destination. Further, he confides that this is his first illegal venture, and he wishes the Honorable Court to know that he will never again become involved in any such activities."

The defendant Jesus Garcia told the same Probation Officer:

"Defendant Jesus Garcia contends that he became involved in the present offense due to the fact that he had been out of work for sometime and was badly in need of money. The day before his arrest a man, name unknown, approached him when he was in Randolph Park. This individual offered him $1,000 to go to Lukeville and drive the stake-bed vehicle to Howard Johnson's. Garcia confides that he knew the vehicle contained marijuana, but due to his financial needs he elected to proceed with the transaction. Garcia reports that the man from Randolph Park advised him about the exact location of the stake-bed truck and all

other pertinent details. Garcia hitchhiked to Lukeville, found the stake-bed vehicle and was returning to Tucson when he was arrested. He was to drive the vehicle to Howard Johnson's, leave the keys in the ashtray, and return to his home. It was his understanding that the individual from Randolph Park would contact him later on and make the $1,000 payment.

"Garcia readily admits his guilt but hastily adds that he will never again become involved in any type of illegal activity. Further, he remarks that he does not know who owned the marijuana, where it was ultimately destined, or any other pertinent information. He stresses the fact that his only part in the operation was to drive the vehicle from Lukeville to Tucson."

On March 29, 1976, Mr. Oseran applied to the Court on behalf of Garcia and Apodaca for permission to appeal in forma pauperis on the ground that each defendant "has no funds or property to hire counsel to prosecute an appeal on his behalf." Rule 24(a), Fed.R.App.P. refers only to the defendant's "inability to pay fees and costs or to give security therefor, his belief that he is entitled to redress, and a statement of the issues which he intends to present on appeal."

Each defendant has made an affidavit substantially complying with Form 4 contained in the Appendix of Forms (Fed.R. App.P.). One owns a 1967 Chevrolet automobile valued at $500 and has $10 in the bank, and the other has absolutely nothing.

We suppose that if the defendants' names indicated that they were of Italian extraction, a newspaper would not hesitate in assuming that they were hirelings of the Mafia and that the Mafia was behind the possession of such a large quantity of marijuana which, based upon the current Tucson value, would be worth upwards of $60,000 according to the Drug Enforcement agents who testify daily as to the value in that city.

We make this Memorandum as required by Rule 24(a), Fed.R.App.P., because we are denying the motion for leave to appeal in forma pauperis. Even if we assume that the motion is for the appointment of counsel under the Criminal Justice Act, we deny it.

It is very difficult for us to understand that the Congress, under the Criminal Justice Act, or the Supreme Court by its promulgation of the Federal Rules of Appellate Procedure, intended to permit convicted defendants to appeal at the taxpayers' expense *when they freely and voluntarily admit their guilt.* We regret that we are unable to find any authority for our action, but perhaps the American public will. There is, however, a growing body of law arising slowly to the surface that there should be a colorable claim of innocence on all appeals. See Friendly, J., *Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments,* 38 U.Chi.L.Rev. 142 (1970), and Mr. Justice Powell, writing for the Chief Justice and Mr. Justice Rehnquist in *Schneckloth v. Bustamonte,* 412 U.S. 218, 250–75, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 876 (1973).